Opinion by Judge WARDLAW; Concurrence by Chief Judge KOZINSKI; Concurrence by Judge PAEZ.
OPINION
WARDLAW, Circuit Judge:
No one would deny that Donald Trump, the real estate magnate, television personality, author, and erstwhile presidential candidate, cuts a celebrated, if controversial, public figure. We must decide whether Trump University, LLC, a private, for-profit entity purporting to teach Trump’s “insider success secrets,” is itself a public or limited public figure so as to implicate the First Amendment. Disgruntled former customer Tarla Makaeff sued Trump University for, among other things, deceptive business practices. In return, Trump University counterclaimed against Makaeff for defamation. Makaeff moved to strike the defamation claim, contending that Trump University is a public figure and therefore must show that she made her allegedly defamatory statements with “actual malice,” a requirement she contends Trump University cannot prove. See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Denying the motion to strike, the district court held that Trump University is not a public figure. We disagree. Trump University is a limited public figure, and, to prevail here, must demonstrate that Ma-kaeff acted with actual malice. Because the district court erred by failing to recognize Trump University’s status as a limited public figure, we reverse and remand for further proceedings.
I.
Donald Trump founded Trump University[1] because he has “a real passion for learning.” Trump, who describes himself as Trump University’s chairman, portrays the venture as the next step in his progression from real estate tycoon to educator. “My books and seminars have always included a strong educational or ‘lessons learned’ slant.... [Trump University] grew out of my desire to impart my business knowledge, accumulated over the years, and my realization that there is a huge demand for practical, convenient education that teaches success.” So born, Trump University took shape as a limited liability company offering real estate seminars and other training programs to would-be real estate investors. Its stated mission is to “train, educate and mentor entrepreneurs on achieving financial independence through real estate investing.”
A.
Trump University has not been shy about touting its connection to its eponymous creator. Evoking Trump’s well-known reality television series, Trump University’s advertisements promise that enrolling in Trump University is “the next best thing to being [Trump’s] Apprentice.” Its advertisements prominently showcase Trump’s photo while urging consumers to “[l]earn from the Master,” and promising to teach Trump’s “insider success secrets.” The home' page of Trump University’s website features Trump’s photo next to the words: “Are YOU My Next Apprentice? *259 Prove it to me!” Trump University students are shown a slide depicting Trump University as the latest of Donald Trump’s achievements, alongside such feats as buying the “Taj Mahal” casino in Atlantic City and completing the “Trump Tower” in Manhattan.
Trump University has collaborated with Donald Trump on several books.[2] It holds the copyright in the books Trum/p 101, written by Donald Trump with Meredith Mclver, see Donald J. Trump, Trump 101: The Way to Success (2007) (“Trump 101 ”), and Wealth Building 101, see Wealth Building 101: Your First 90 Days on the Path to Prosperity (Donald J. Tramp, ed. 2007) (“Wealth Building 101 ”). Both works tout Trump’s involvement with Tramp University. For instance, in his Foreword, to Trump 101, Michael Sexton, the president of Trump University, asserts that Donald Trump “has made the decision to become an educator himself, through his public appearances, The Apprentice, his books, and now, Trump University.” Michael Sexton, Foreword to Trump 101, at xiv. In the Foreword to Wealth Building 101, president Sexton asserts that
[o]ther organizations try to sell help alone, without the proven expertise to back it up, and just when you begin to realize that the advice you paid for is .unproven and ineffective — they try to sell you more expensive products. They hook you on promises and never deliver;
Neither I nor our chairman, Donald J. Tramp, would stand for that at Tramp University.
Michael Sexton, Foreword to Wealth Building 101, atix.
Almost from its inception, Tramp University drew public comment. Donald Trump referenced the attention in 2005, noting in a blog post on the Trump University website that the nationally syndicated comic strip “Doonesbury” spent a week lampooning “the disparity between [Tramp University] and a traditional university.” The post was entitled: “We’re laughing all the way to the bank.”[3] By 2007, however, disappointed customers had begun posting complaints about Trump University on Internet message boards. Some posts alleged that Tramp University programs were “scams” that focused on “upselling” customers to more expensive seminars and workshops. In late 2007, an investigative article by journalist David Lazarus of the Los Angeles Times, questioned Tramp University’s business practices in the larger context of the subprime mortgage crisis. See David Lazarus, Trump Spins in Foreclosure Game, L.A. Times, at Cl, December 12, 2007. The column quoted Donald Trump (“I love helping people”) and described a satisfied Tramp University customer (“I have control of four properties”), but also cited the skepticism of real estate experts over “pushing] neophytes to take such risks” in the burgeoning foreclosure market.[4] Id.
*260 B.
In August 2008, Tarla Makaeff attended Trump University’s three-day “Fast Track to Foreclosure Workshop” at a cost of approximately $1,495, which Makaeff says she split with a friend: Makaeff describes the seminars as slick productions featuring carefully choreographed presentations, speakers blaring “For the Love of Money,” the theme song from Trump’s hit reality television series “The Apprentice,” and Trump University representatives exhorting customers to raise their credit card limits, ostensibly to enable “real estate transactions,” but actually to facilitate the purchase of the $34,995 “Trump Gold Elite Program.”
Apparently persuaded, Makaeff paid $34,995 to enroll in the Gold Elite Program, which entitled her to four three-day “advanced training workshops,” a three-day “mentoring session in the field,” and "training publications, software, and other material’s.” Makaeff s satisfaction with the program was short-lived. In April 2009, after completing five more programs and workshops, and after seven months of the Gold Elite Program, she wrote an email to Trump University complaining that she was in a “precarious financial position” and that she “did not receive the value that I thought I would for such a large expenditure.” Makaeff had earlier spoken by phone with a Trump University representative who had told her that she was ineligible for a refund of the cost of the program. In response to Makaeffs email, Trump University offered more free “mentoring services,” which Makaeff accepted.
By Fall 2009, however, the relationship between Makaeff and Trump University had gone irretrievably south. Makaeff wrote to her bank and the Better Business Bureau, contacted government agencies, and posted on Internet message boards about her dispute with Trump University. Makaeff requested a refund of $5,100 from her bank for services charged for Trump University programs. In the letter to the Better Business Bureau, Makaeff requested a refund of her payments for services that she did not receive: In both letters, Makaeff asserted that Trump University engaged ' in “fraudulent business practices,” “deceptive business practices,” “illegal predatory high pressure closing tactics,” “personal financial information fraud,” “illegal bait and switch,” “brainwashing scheme[s],” “outright fraud,” “grand larceny,” “identity theft,” “unsolicited taking of personal credit’ and trickery into [sic] opening credit cards,” “fraudulent business practices utilized for illegal material gain,” “felonious teachings,” “neu-rolinguistic programming and high pressure sales tactics'based on the psychology of scarcity,” “unethical tactics,” “a gargantuan amount of misleading, fraudulent, and predatory behavior,” and business practices that are “criminal.” Trump University claims that Makaeff published similar statements to unknown third parties and to the general public on the Internet.
In April 2010, Makaeff filed a class action complaint against Trump University, accusing it of, among other things, deceptive business practices. Trump University counterclaimed against Makaeff for defamation based on the statements in her letters and Internet postings. Thereafter, Makaeff moved under California’s “anti-SLAPP” law, California Code of Civil Procedure § 425.16, to strike the defamation claim, a motion the district court denied. While it held that Trump University’s suit arose from protected conduct under the anti-SLAPP statute, the court concluded *261 that Trump University had demonstrated a reasonable probability of prevailing on the merits of its defamation claim, and therefore dismissal of that claim under the anti-SLAPP statute was not warranted.
II.
California law provides, for the pre-trial dismissal of certain actions, known as Strategic Lawsuits Against Public Participation, or SLAPPs, that “ ‘masquerade as ordinary lawsuits’ ” but are intended to deter ordinary people “from exercising their political or legal rights or to punish them for doing so.” Batzel v. Smith, 333 F.3d 1018, 1024 (9th Cir.2003) (quoting Wilcox v. Superior Court, 27 Cal. App.4th 809, 33 Cal.Rptr.2d 446, 450 (1994)). We have jurisdiction to review the district court’s denial of Makaeff s anti-SLAPP motion under the collateral order doctrine. See Hilton v. Hallmark Cards, 599 F.3d 894, 900 & n. 2 (9th Cir.2010); see also Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1109 (9th Cir.2003) (“Motions to strike a state law claim under California’s anti-SLAPP statute may be brought in federal court.”). We review de novo the district court’s determination of a motion to strike under California’s anti-SLAPP statute. Vess, 317 F.3d at 1102; Gilbert v. Sykes, 147 Cal.App.4th 13, 53 Cal.Rptr.3d 752, 760 (2007).
III.
California’s anti-SLAPP statute allows a defendant to file a “special motion to strike” to dismiss an action before trial. Cal.Civ.Proc.Code § 425.16. To prevail on an anti-SLAPP motion, the moving defendant must make a prima facie showing that the plaintiffs suit arises from an act in furtherance of the defendant’s constitutional right to free speech. Batzel, 333 F.3d at 1024. The burden then shifts to the plaintiff, here Trump University, to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal. Cal.Civ.Proc. Code § 425.16(b)(1); Gilbert, 53 Cal. Rptr.3d at 760. Under this standard, the claim should be dismissed if the plaintiff presents an insufficient legal basis for it, or if, on the basis of the facts shown by the plaintiff, “no reasonable jury could find for the plaintiff.” Metabolife Int’l, Inc. v. Wornick, 264 F.3d 832, 840 (9th Cir.2001) (citation and internal quotation marks omitted).
In evaluating Makaeff s anti-SLAPP motion, the district court held that Makaeff had met her initial burden of showing that Trump University’s claim arose from an act by Makaeff in furtherance of her free speech rights. Proceeding to the second step, the court concluded that Trump University had established a reasonable probability of success on the merits of the defamation claim. In particular, it held that Trump University was not a public figure under Gertz v. Robert Welch, Inc., 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and Trump University therefore did not need to meet the heightened standard of proof for defamation established in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710,11 L.Ed.2d 686 (1964). Under this heightened standard, Trump University would have been required to show that Makaeff made her statements with actual malice. Gertz, 418 U.S. at 342, 94 S.Ct. 2997.
A.
The district court was correct that Makaeff met her initial burden of showing that Trump University’s defamation claim arose from an act in furtherance of her free speech rights. Vess, 317 F.3d at 1110. Under California’s anti-SLAPP statute, such acts must be “in connection with a public issue,” and include:
*262 (1) any written or oral statement or writing made before a legislative, executive, or judicial'proceeding, or any other official proceeding authorized by law, .
(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, ■ .
(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or
(4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.
Cal.Civ.Proc.Code § 425.16(e). The district court determined that Makaeffs statements fell into the fourth category, conduct in connection “with a public issue or an issue of public interest,” because the statements provided “consumer protection information.”
Under California law, statements warning consumers of fraudulent or deceptive business practices constitute a topic of widespread public interest, so long as they are provided in the context of information helpful to consumers. For instance, in Wilbanks v. Wolk, 121 Cal.App.4th 883, 17 Cal.Rptr.3d 497 (2004), Gloria Wolk, a consumer advocate and expert on viatical settlements (arrangements in which dying persons sell their life insurance policies to investors to help pay for medical care and other expenses), posted negative comments on her website about a certain broker of such settlements. Id. at 499, 507. The California Court of Appeal held that the statements were protected activity under the anti-SLAPP statute because they were “consumer protection information.” Id. at 507. It reasoned:
The statements made by [the defendant] were not simply a report of one broker’s business practices, of interest only to that broker and to those who had been affected by those practices. [The defendant’s] statements were a warning not to use plaintiffs’ services. In the context of information ostensibly provided to aid consumers choosing among brokers, the statements, therefore, were directly connected to an issue of -public concern.
Id. at 507-08.
Similarly, in Paradise Hills Associates v. Procel, 235 Cal.App.3d 1528, 1 Cal. Rptr.2d 514 (1991), the California Court of Appeal held that a disgruntled buyeFs statements made against a seller were protected by the First Amendment. Id. at 523. There, a homeowner embroiled in a dispute with a residential developer posted signs on her house, spoke with reporters, distributed leaflets, and spoke to prospective customers to urge them not to buy houses from the developer. Id. at 516. The developer sued, arguing that the homeowner’s statements were not protected by the First Amendment because they “relate solely to her private concerns.” Id. at 522. ^ Rejecting that argument, the court reasoned that consumers, have an “ ‘interest in matters which affect their roles as consumers.’ ” Id. (quoting Concerned Consumers League v. O’Neill, 371 F.Supp. 644, 648 (E.D.Wis.1974)). The court therefore held that the First Amendment protected the homeowner’s statements. Id. at 523.
Here, according to Trump University’s defamation counterclaim, Makaeff published statements to “unknown third parties and the general public on the Internet.”[5] *263 Makaeff claims she posted these statements “to alert other consumers of my opinions and experience with Trump University,” and to “inform other consumers of my opinion that Trump University did not deliver what it promised.” Her explanation is plausible. Makaeff s letter to her bank suggests that she spoke out with the goal of stopping Trump University from defrauding other consumers:
I am contacting the Better Business Bureau (BBB), the Federal Trade Commission (FTC), Bureau of Consumer Protection and the FDIC as well as posting the facts of my highly negative experience on a wide variety of Internet sites to ensure that this organization at some point is stopped from defrauding others with its predatory behavior. I am also contacting the media to give them a statement of facts so that they can expose this scam and am willing to go to whatever lengths necessary to obtain my money back including taking legal action at the state and federal levels for this crime that has been committed to [sic] thousands of students nationwide who have been preyed on and victimized as I know I am one of many.
Makaeff s posts on anonymous third-party websites could not have resolved her private dispute with Trump University. We therefore conclude that the postings constituted consumer protection information because they were intended as “a warning not to use plaintiffs’ services”- and came in the context of information that was “provided to aid consumers.”[6] Wilbanks, 17 Cal.Rptr.3d at 508.
Moreover, we have doubts about Trump University’s claim that Makaeff wrote her letters to her bank and the Better Business Bureau with purely private motives. The Better Business Bureau identifies its mission as advancing trust in the marketplace by offering objective and unbiased information about businesses to consumers.[7] Therefore, the statements Makaeff made in her letter to the Bureau, even if made in the context of a request that it intercede in her dispute with Trump Uni-, versity, are not so easily separated from “information ... provided to aid consumers.” Id.
Because at least some of Makaeffs statements were made with the intent to warn consumers about the educational experience at Trump University, we agree with the district court that Trump University’s counterclaim arises from an act protected under the anti-SLAPP statute.
B.
Because Trump University’s counterclaim-arose from an act protected under *264 the anti-SLAPP statute, the burden shifts to Trump University to show a, reasonable probability of prevailing on the merits of its claim. Metabolife Int% 264 F.3d at 840. Trump University’s claim is for defamation, “an invasion of the interest in reputation.” Gilbert, 53 Cal.Rptr.3d at 764. Under California law, defamation is “ ‘the intentional publication of a statement of fact which is false,-unprivileged, and. has a natural tendency to injure or which causes special damage.’ ” Id. (quoting Ringler Assocs., Inc. v. Md. Cas. Co., 80 Cal. App.4th 1165, 96 Cal.Rptr.2d 136, 148 (2000)). Before we address Trump University’s specific allegations to determine whether it has met its burden, we must first decide (1) whether Makaeffs speech is protected by California’s litigation privilege, and (2) whether Trump University is a “public figure.”
1.
If Makaeffs statements' lie within California’s statutory litigation privilege, then Trump University has no probability of success on the merits and Makaeffs special motion to strike should have been granted. California Civil Code section 47(b) renders privileged, inter alia, any publication of a statement made in a judicial proceeding, or “in the initiation or course of any other proceeding authorized by law,” with some specific exceptions. Cal. Civ.Code § 47(b). “[T]he privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.” Silberg v. Anderson, 50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365, 369 (1990). The privilege also applies to a communication related to an anticipated lawsuit, if it is preliminary to an imminent proposed lawsuit contemplated in good faith and the purpose of the proposed litigation is to resolve the .dispute. Edwards v. Centex Real Estate Corp., 53 Cal.App.4th 15, 61 Cal.Rptr.2d 518, 530-31 (1997).
The district .court correctly concluded that Makaeffs statements are not protected by California’s section 47(b) litigation privilege. Makaeff cannot assert the privilege on the basis that her statements were made in advance of an anticipated lawsuit. Makaeffs letters make no statement more concrete than that she would be willing to go to any lengths, including legal action, to get back her money. Therefore, any lawsuit at the time she made her statements was nothing more than a mere possibility, not imminent proposed litigation. Id. at 530.
Moreover, Makaeff made her statements not in a judicial proceeding, but to a private bank, the Better Business Bureau, and to the general public on the Internet. Although California courts have extended the litigation privilege to quasi-judicial proceedings such as private commercial arbitration, see, e.g., Moore v. Conliffe, 7 Cal.4th 634, 29 Cal.Rptr.2d 152, 871 P.2d 204, 219 (1994), Makaeff was not actually in arbitration with Trump University, as she asserts. California courts have extended the litigation privilege to only formal arbitration or mediation proceedings to which the parties consented as an alternative to trial. See, e.g., Howard v. Drapkin, 222 Cal.App.3d 843, 271 Cal.Rptr. 893, 905-06 (1990) (where plaintiff and ex-husband stipulated that an independent psychologist would serve as a neutral third party to perform dispute resolution services, the psychologist was entitled to protection for statements made during resulting proceeding). Trump University never consented to arbitration or mediation proceedings -with Makaeff, her bank, or the Better Business Bureau.
*265 2.
The next question we must answer is whether Trump University is a public figure under New York Times Co. v. Sullivan. If so, Trump University must demonstrate by clear and convincing evidence that Makaeff made her allegedly defamatory statements with-“actual malice"; that is, “with knowledge of [their] falsity or with reckless disregard for the truth.” Gertz, 418 U.S. at 328, 342, 94 S.Ct. 2997. If, upon remand, Trump University cannot make such a showing, it has no possibility of success on the merits and the district court should grant Makaeffs special motion to strike.
In Gertz, the Supreme Court identified two types of public figures: (1) all purpose, public figures, who occupy “positions of such persuasive power and influence that they are deemed public figures for all purposes,” and (2) limited purpose public figures, who achieve their status by “thrustfing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.” Id. at 345, 94 S.Ct. 2997. Because “[i]n either case such persons assume special prominence in the resolution of public questions,” both categories of public figures are subject to the heightened burden of proof in defamation cases. Id. at 351, 94 S.Ct. 2997.
The Court articulated two policy reasons for requiring public figures to show actual malice. First, public figures enjoy “greater access to the channels of effective communication” than private individuals, and are therefore better able to “contradict the lie or correct the error.” Id. at 344, 94 S.Ct. 2997. Second, the Court identified a normative consideration, rooted in the observation that public figures became such “by reason of the notoriety of their achievements or the vigor and success with which they seek the public’s attention.” Id. at 342, 94 S.Ct. 2997. In other words, true public figures voluntarily assume positions of importance in society. Public speakers, the Court noted, were thus entitled to act on the assumption that such public figures had also willingly exposed themselves to the risk of injury from defamatory falsehood. Id. at 345, 94 S.Ct. 2997.
a.
The district court correctly held that Trump University is not an all purpose public figure. “Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society,” an individual is not a public figure for all purposes. Id. at 352, 94 S.Ct. 2997. The record does not support the conclusion that Trump University is generally famous or that it wields vast influence in public affairs. Makaeff argues that Trump University is a public figure because of its status as a ’“university.” A handful of New York state cases have held that private colleges and universities are all purpose public figures, see, e.g., Ithaca Coll. v. Yale Daily News Publ’g Co., 105 Misc.2d 793, 433 N.Y.S.2d 530, 534 (App. Div.1980), but those cases are inapposite. Trump University has little in common with the Ithaca Colleges of the world. As a private, for-profit entity offering real estate seminars to small groups of students, it possesses neither a large, diverse student body, nor “general fame, or notoriety” in the community, both factors which the New York Supreme Court, Appellate Division, found dispositive in Ithaca College. Id. Indeed, Trump University more closely resembles the private computer programming school in Commercial Programming Unlimited v. Columbia Broadcasting Systems, Inc., 81 Misc.2d 678, 367 N.Y.S.2d 986, 992 (Sup.Ct.1975), rev’d on other grounds, 50 A.D.2d 351, 378 *266 N.Y.S.2d 69 (1975), which the New York court concluded was not a public figure.
Makaeff and amicus ACLU Foundation of San Diego and Imperial Counties, Inc. also argue that Trump University is an all purpose public figure because it is inextricably intertwined with Donald Trump, who all parties agree is an all purpose public figure for First Amendment purposes. Makaeff and the ACLU contend that pern Trump’s public figure status should be imputed to Trump University. We find this argument unavailing. Makaeff cites for support an out-of-circuit district court opinion, Schiavone Construction Co. v. Time, Inc., 619 F.Supp. 684 (D.N.J.1985), which we do not find apposite. There, contractor Ronald Schiavone and his construction company brought a libel action against Time, Inc., over a magazine article that linked the name Schia-vone to organized crime. Id. at 686-87. The court held in a footnote that if Schia-vone was a public figure, then so was his company:
Plaintiffs’ status in this regard is identical one to the other. The court’s holding that defamation of Schiavone Construction Co. ■ may be “of and concerning” plaintiff Ronald Schiavone, simply because the two are inextricably intertwined by name and corporate structure,- requires that if one is deemed a public figure so must the other be.
Id. at 704 n. 13 (citation omitted).
In Schiavone, the court’s holding was based on its earlier observation that Schia-vone was the principal owner, chairman of the board of directors, CEO, and person “who might well have been responsible for the major decisions” of his construction company. Id. at 697. Although Donald Trump is the founder and chairman of Trump University, he is not so “inextricably. intertwined” with Trump University’s corporate structure and daily affairs as to in effect be the alter ego of the University, a showing Schiavone seems to require.[8]
b.
Because Trump University is not an all-purpose public figure, we examine the nature and extent of Trump University’s “participation in the particular controversy giving rise to the defamation” to determine whether it is a public figure for the limited purposes of a defamation claim over its educational practices. Gertz, 418 U.S. at 352, 94 S.Ct. 2997. In undertaking this inquiry, we consider whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to the plaintiffs participation in the controversy, and (iii) whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy’s ultimate resolution. Gilbert, 53 Cal.Rptr.3d at 762; see also Gertz, 418 U.S. at 351-52, 94 S.Ct. 2997. The district court assumed without deciding that a public controversy existed regarding Trump University’s business practices, but held that Trump University did nothing to voluntarily thrust itself into the controversy. We disagree with this holding.
i.
We have little difficulty in concluding that a public controversy existed over Trump University’s educational and *267 business practices when Makaeff made her statements about them. As Donald Trump himself admits on the Trump University website, Trump University provoked public attention nearly from the outset, much of it derisive. Of course, general interest in Donald Trump is not sufficient to create a public controversy. Cf. Time, Inc. v. Firestone, 424 U.S. 448, 454-55, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (“[Dissolution of a marriage through judicial proceedings is not the sort of ‘public controversy’ referred to in Gertz.”). Instead, a public controversy “must be a real dispute, the outcome of which affects the general public or some segment of it.” Waldbaum v. Fairchild Publ’ns, 627 F.2d 1287, 1296 (D.C.Cir. 1980); see also Annette F. v. Sharon S., 119 Cal.App.4th 1146, 15 Cal.Rptr.3d 100, 112 (2004).
Here, any general interest in Trump University stemming from its celebrity founder soon ripened into an actual dispute over Trump University’s business and educational practices. By 2007 and 2008, disgruntled Trump University customers were posting complaints on public Internet message boards. Also by 2007, a columnist for a mass market newspaper had begun to report on Trump University’s educational practices and business model. See Lazarus, Trump Spins in Foreclosure Game, supra. The column describes a Trump University seminar in unflattering terms, quotes both supporters and detractors of Trump University’s programs, and discusses Trump University’s educational practices against the backdrop of the mortgage foreclosure crisis. Id. We therefore conclude that by Fall 2009, the “specific question” of Trump University’s legitimacy had become a public controversy. Waldbaum, 627 F.2d at 1297.
Moreover, this dispute had the potential to affect “the general public or some segment of it in an appreciable way.” Id. at 1296. -Trump University’s business model involved offering seminars that encouraged members of the public to participate in the market for foreclosed properties, which had grown substantially in the wake of the 2007 financial and mortgage crisis. These activities, carried out by Tramp University and other purveyors of real estate investment advice; had the potential to affect local housing markets by increasing or decreasing real estate speculation in the market for foreclosed homes. The debate over Trump University’s business practices thus held ramifications not just for Trump University and its customers, but for all participants in the local housing markets. See id. at 1299 (a public debate over the marketing policies of a cooperative supermarket held the potential to affect consumers and industry retailers in-the surrounding area).
Thus, a public controversy existed over Trump University’s business practices at the time Makaeff made her statements in Fall 2009.
ii.
The district court erroneously concluded that Trump University did not voluntarily inject itself into this public controversy. Under Gertz, Trump University must have “thrust [itself] to the forefront” of this particular controversy “in order to influence the resolution of the issues involved.” 418 U.S. at 345, 94 S.Ct. 2997] The district court concluded that even if Trump Üniversity was involved in the controversy over its allegedly deceptive business practices, its involvement was not voluntary. We disagree.
We hold, as have the Third and Fourth Circuits, that large scale, aggressive advertising can inject- a person or entity into a public controversy that arises from the subject of that advertising. Ad *268 vertising, conducted on a large scale and addressing or creating a public controversy, can be a way of “voluntarily expos[ing] [the company] to increased risk of injury from defamatory falsehood” concerning the company and its advertised products. Id. Moreover, entities that advertise aggressively “enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then [sic] private individuals normally enjoy.” Id. at 344, 94 S.Ct. 2997.
In Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264 (3d Cir.1980), for instance, the Third Circuit considered a defamation suit against a television consumer affairs reporter for WTAE-TV in Pittsburgh, who was investigating a four-day steak-sale bonanza promoted by a company called Steaks Unlimited. She reported that the quality of the steaks was low and the prices high, and further stated that Steaks Unlimited’s advertising was deceptive. Id. at 268. The Third Circuit held that Steaks Unlimited was a limited purpose public figure because of its “advertising blitz”:
Immediately upon its entry into the Pittsburgh area, Steaks launched an intensive campaign over local radio stations, through local newspapers, by large signs displayed at the sales locations and by handbills given to persons walking near Steaks Unlimited Sales locations at the various Zayre stores. The advertising costs exceeded $16,000.00. Moreover, both WTAE-TV and' the Bureau of Consumer Affairs received numerous telephone complaints from Pittsburgh area consumers, complaining about the poor quality of Steaks Unlimited’s beef as well as (about) asserted misrepresentations as to the quality and type of beef being sold. Under these circumstances, the district court properly concluded that Steaks voluntarily injected itself into a matter of public interest — indeed, it appears to have created a controversy — for the purpose of influencing the consuming public. In short, through its advertising blitz, Steaks invited public attention, comment, and criticism.
Id. at 273-74 (internal quotation marks and footnotes omitted).[9] Similarly, the Fourth Circuit has held that an organization was a limited purpose public figure based not only on the fact of extensive aggressive advertising but upon a “direct relationship between the promotional message and the subsequent defamation (indicating plaintiffs pre-existing involvement in the particular matter of public concern and controversy).” Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 687 (4th Cir. 1989) (describing Nat’l Found, for Cancer Research, Inc. v. Council of Better Bus. Bureaus, Inc. (NFCR), 705 F.2d 98 (4th Cir.1983)).
Here, as in Steaks Unlimited and in NFCR, Trump University conducted an aggressive advertising campaign in which it made controversial claims about its products and services. This campaign included online, social media, local and na *269 tional newspaper, and radio advertisements for free introductory seminars. Claims of legitimacy were also propounded in the Foreword to Trump 101.[10] The Foreword to Wealth Building 101 specifically denied that Trump University engaged in the practices that were the target of Makaeffs allegedly defamatory statements.[11] This entire advertising campaign makes Trump University a limited public figure for purposes of the controversy that arose about the legitimacy of its educational practices because its extensive advertising efforts “invited public attention, comment, and criticism.” Steaks Unlimited, Inc., 623 F.2d at 274. Moreover, there is a “direct relationship” between Trump University’s promotional messages and Ma-kaeffs allegedly défamatory statements, which reflects Trump University’s pre-ex-isting involvement in this particular matter of public concern and controversy. See Blue Ridge Bank, 866 F.2d at 687; see also Gilbert, 53 Cal.Rptr.3d at 762 (“[T]he alleged defamation must be germane to the plaintiffs participation in the controversy.”) (quoting Ampex Corp. v. Cargle, 128 Cal.App.4th 1569, 1577, 27 Cal.Rptr.3d 863 (2005)). We hold that under these circumstances Trump University is a limited purpose public figure with respect to the subject of its advertising.
We reject Trump University’s argument, based on the reasoning of the California Supreme Court in Vegod Corp. v. American Broadcasting Cos., 25 Cal.3d 763, 160 Cal.Rptr. 97, 603 P.2d 14 (1979), that aggressive advertising of a message addressing a public controversy cannot render an entity a limited public figure. In Vegod, two firms sued for defamation over a television news report criticizing the firms’ business practices in conducting a closeout sale for a respected but bankrupt department store, the City of Paris, the closing of which had generated a public controversy given the storeys landmark status. Id., 160 Cal.Rptr. 97, 603 P.2d 14 at 15. The California Supreme Court held that the plaintiffs were not limited public figures. Id., 160 Cal.Rptr. 97, 603 P.2d 14 at 17. It reasoned that while the close-out firms had conducted aggressive advertising, their advertising standing alone did not render them public figures. Noting that “[i]t does not appear that plaintiffs urged City of Paris publicly or otherwise to- terminate business or to destroy the. ‘landmark,’ ” the court concluded that the advertising had not thrust the plaintiff fircns into the vortex of the controversy. Id. “Merely doing business with parties to a public controversy, does not elevate one to public figure status.” Id.
Vegod is- distinguishable. There, the plaintiffs’ close-out advertising did not address the controversy over the planned destruction of the landmark store, and thus the firms were not limited public figures for purposes of that controversy. Id. There was no nexus between the critical news reports and the controversial destruction of the store. See Gilbert, 53 Cal.Rptr.3d at 762. Here, Trump University’s advertisements, including Sexton’s statements, both directly and indirectly address the .subject of Trump University’s *270 educational practices. Trump University therefore became a limited public figure in the context of the controversy over those practices. Moreover, the limited public figure analysis' is not a matter of state substantive law, but rather a pure constitutional. question. See Gertz, 418 U.S. at 332-35, 94 S.Ct. 2997 (discussing the “constitutional privilege” established by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). We are simply not bound by California decisions on this issue.[12]
. To be clear: Trump University is not a public figure because Donald Trump is famous arid controversial. Nor is Trump University a public figure because it utilized Donald Trump as a celebrity pitchman. Trump University is a limited public figure because a public debate existed regarding its aggressively advertised educational practices. Did Trump’s famous moniker draw public attention when Trump University’s business practices proved worthy of debate? Perhaps. However, having traded heavily on the name and fame of its founder and chairman, Trump University was in no- position to complain if the public’s interest in Trump fueled the flames of the legitimate controversy that its business practices engendered.
c.
The district court concluded that Trump University was not a limited public figure, and thus did not reach the question of actual malice.[13] Because Trump University is a limited purpose public figure, to prevail on its defamation claim it must establish that Makaeff made her statements with “actual malice,” i.e., knowledge of their falsity or reckless disregard of their truth. Gertz, 418 U.S. at 342, 94 S.Ct. 2997. To demonstrate reckless disregard of the truth, Trump University must show by clear and convincing evidence that Makaeff “entertained serious doubts as to the truth” of her statements. Id. at 331-32, 334 n. 6, 94 S.Ct. 2997 (quoting St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968))., If Makaeff was simply republishing a third party’s allegations, mere proof of her failure to investigate the veracity of such allegations does not establish reckless disregard for the truth. Id. at 332, 94 S.Ct. 2997. Trump University would then *271 need to show “obvious reasons” to doubt the truthfulness of the original speaker, or the accuracy of his statements. Harte-Hanks Commc’ns, Inc. v. Connaughton, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (quoting St. Ammt, 390 U.S. at 732, 88 S.Ct. 1323).
On appeal Trump University nevertheless argues that Makaeffs early testimonials praising Trump University indirectly prove that she acted with a high degree of awareness of the probable falsity of her later statements.[14] However, it is plausible that Makaeff sincerely believed in Trump University’s offerings when she submitted her written and videotaped testimonials. The gist of Makaeffs complaint about Trump University is that it constitutes an elaborate scam. As the recent Ponzi-scheme scandals involving one-time financial luminaries like Bernard Madoff and Allen Stanford demonstrate, victims of con artists often sing the praises of their victimizers until the moment they realize they have been fleeced. Makaeffs initial enthusiasm for Trump University’s program is not probative of whether she acted with actual malice.
That Makaeffs initial email to Trump University- omitted the complaints of Trump University’s alleged conduct that she later published to third parties also proves little. Makaeffs first email to Trump University was .a request for, a refund. It is possible that Makaeff chose to take a more conciliatory tone at this early stage of their increasingly acrimonious dialogue in the hopes of getting her money back. Thus, the district court may find that this initial email is consistent both with Makaeffs later, supposedly defamatory statements, and her eontempora-neous goal of persuading Trump University to give her a refund.
Trump University further asserts that Makaeff recklessly republished the unverified complaints of anonymous third parties on the Internet. While the Supreme Court in St. Ammt suggested that a statement “based wholly on an unverified anonymous telephone call” might justify a finding of actual malice, id. at 732, 88 S.Ct. 1323, the district court may reach the contrary conclusion: that Makaeffs statement's were not based wholly on the anonymous Internet postings but were instead based on Makaeffs own educational experience. That Makaeff herself was disenchanted with Trump University may explain why she would not believe that the critical postings of- others were “inherently improbable.” Id. Nor would the circumstances- of the Internet postings necessarily give Makaeff obvious reasons to doubt them — the postings were made on an Internet message board that offered no particular benefit to those who published statements criticizing Trump University.
IV.
Because Trump University is a public figure for the limited purpose of the public controversy over the quality of the education it purports to provide, the district court must address the inherently fact-intensive question of whether Trump University has a reasonable probability of proving, by clear and convincing evidence, that Makaeff made her critical statements with actual malice. We therefore REVERSE the district court’s denial of Ma-kaeffs motion to strike Trump University’s counterclaim pursuant to California’s *272 anti-SLAPP statute, and REMAND for further proceedings consistent with this opinion.
REVERSED; REMANDED.

. After this action was filed, Trump University changed its name to "The Trump Entrepreneur Initiative” because New York State Department of Education officials objected to the corporation’s use of the term "University.” See Michael Barbara, New York Attorney General is Investigating Trump’s For-Profit School, N.Y. Times, May 20, 2011, at A 18. For purposes of continuity, we use the name Trump University.

.We grant Makaeff s requests to take notice of book collaborations between Donald Trump and Trump University, newspaper and magazine articles, and web pages. See Fed. R.Evid. 201; Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir.2010) (holding that it is proper to take judicial notice of various publications introduced "to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true”) (internal quotation marks and citation omitted).

. The post also noted that Trump University had been mocked in one of television host Jay Leno’s monologues and the New York Post's Page Six cartoon.

. Four days later, the Los Angeles Times ran a follow-up piece by the same journalist, recounting a phone conversation he enjoyed with an irate Donald Trump following publi *260 cation of the first column. See David Lazarus, Trump’s a Grump About Column on His ‘Priceless’ Tips, L.A. Times, at Cl, December 16, 2007.

. Trump University’s appellate briefing omits any mention of Makaeffs Internet postings, *263 limiting its arguments to the statements found in Makaeff's letters. However, California’s anti-SLAPP statute instructs the court to base its determination on the “pleadings” and “affidavits” of the parties. Cal.Civ.Proc.Code § 425.16(b)(2). Trump University’s pleadings and the declarations of Makaeff and Trump University president Michael Sexton reference the Internet postings. Moreover, the district court referenced those Internet postings in the order denying Makaeff's motion. We are therefore satisfied that Trump University’s counterclaim “aris[es],” at least in part, from Makaeff's Internet postings to anonymous third parties. Cal.Civ.Proc.Code § 425.16(b)(1).

. In her declaration supporting her motion to strike, Makaeff asserts that she contacted the Attorney General of New York, Federal Trade Commission, Federal Bureau of Investigation, New York State Board of Education, New York Bureau of Consumer Protection, and New York District Attorney Special Prosecutors Bureau regarding Trump University.

. See Vision, Mission and Values, BBB, http:// www.bbb.org/us/mission-and-values/ (last visited Mar. 22, 2013).

. Trump University argues that because the district court in Schiavone made its holding in the context of determining whether the plaintiff was a limited purpose public figure, see Schiavone, 619 F.Supp. at 702, that holding has no relevance to the question of whether Trump University is an all purpose public figure. Because we conclude that Schiavone is inapposite in any case, we do not address this argument.

. The Third Circuit has refused to extend the principle to cases involving defamatory advertisements-by competitors. See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 938-39 (3d Cir.1990). There, two health-care companies engaged in negative comparative advertising. Id. at 917-20. The court noted that “[u]nder traditional defamation analysis, the parties’ considerable access to the media and their voluntary entry into a controversy are strong indicia that they are limited purpose public figures.” Id. at 938. But the court noted that Steaks Unlimited "involved a consumer reporter’s statement, not a comparative advertising campaign.” Id. at 938 n. 29. Such statements merited stronger protection than commercial advertising, which was "chill-resistant” and not designed to air issues of public concern. ' Id. at 938-39.

. For instance, it asserts that Donald Trump is "dedicated to education,” and that Trump’s “direct insights, experiences, and practical know-how [will] guide” Trump University students "throughout” their experience. Sexton, Foreword to Trump 101, at xiv.

. In it, Sexton notes that some organizations "hook you on promises and never deliver,” and, moreover, that "just when you begin to realize that the advice you paid for is unproven and ineffective — they try to sell you more expensive products.” Sexton, Foreword to Wealth Building 101, at ix. He promises, "Neither I .nor our chairman, Donald J. Trump, would stand for that at Trump University.” Id.

. Subsequent decisions by lower California courts appear to have extracted from Vegod an inflexible rule that advertising never constitutes "thrusting oneself into the vortex of a controversy.” Rancho La Costa, Inc. v. Superior Court, 106 Cal.App.3d 646, 661, 165 Cal. Rptr. 347 (1980) ("The holding of Vegod sufficiently answers that advertising is not thrusting oneself into the vortex of a controversy.”); see also Hufstedler, Kaus & Ettinger v. Superior Court, 42 Cal.App.4th 55, 70, 49 Cal. Rptr.2d 551 (1996) (citing Vegod send Rancho La Costa for the proposition that, in a libel suit, the plaintiff bank’s “advertisements themselves could not have been sufficient to transform the Bank into a public figure”). We believe these subsequent, cases misread Vegod-, we do not read Vegod to have opined either so broadly or so rigidly. In any event, we are not bound by California state decisions because whether Trump University is a limited public figure is a question determined under federal constitutional law.

. Because a showing of actual malice necessarily depends on the falsity of the statements at issue, the district court may assume the falsity of the statements and proceed directly to the actual malice inquiry. If it concludes that Trump University cannot establish a reasonable probability of proving actual malice, it need not inquire whether the statements were actually false for purposes of ruling on the motion to strike. Cf. Underwager v. Channel 9 Austl., 69 F.3d 361, 368 (9th Cir.1995) (where the defamation plaintiff-appellant failed to demonstrate the existence of a material dispute about actual malice, the reviewing court need not decide whether he had established a dispute over falsity).

. While still in the program, Makaeff described Trump University’s programs as “amazing” and "excellent” on rating sheets provided by Trump University. Later, in June 2009, she was videotaped at a workshop praising her mentor and saying favorable things about Trump University.