Filed 8/28/15  Leonard v. Aruda CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| DUANE M. LEONARD, as Trustee, etc.,<br><br>        Plaintiff and Respondent,<br>v.<br>NICOLE M. ARUDA et al.,<br><br>        Defendants and Appellants. | A143518<br><br>(Alameda County<br>Super. Ct. No. RG14710643) |

Duane M. Leonard, in his capacity as trustee, attempted to sell residential property located at 474–478 McAuley Street, Oakland (the Property).  Neighbors Nicole and Eric Aruda sent e-mails to Leonard's realtor and prospective buyers claiming one of two houses on the Property encroached upon their land, violated building and fire codes, and was not legally constructed.  As a result, two prospective buyers cancelled plans to purchase the Property.  Leonard sued the Arudas for tortious interference with the prospective sales.  The Arudas moved to strike the complaint as a strategic lawsuit against public participation (SLAPP) pursuant to Code of Civil Procedure section 425.16.[1]  The trial court denied the motion on the basis that the action arose from a private dispute rather than from protected activity related to a matter of public interest.  We agree and affirm.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

1

# I.     BACKGROUND[2]

Leonard is the trustee of a trust that owns the Property. Two residences are on the Property, one known as the "Main House" and another known as the "Back House." The Arudas own and live on adjacent property at 480 McAuley Street.

In May 2012, Leonard listed the Property for sale. On about June 25, he entered into a contract to sell the Property to Joanna Wulbert for $530,000. Nicole Aruda then e-mailed Leonard's realtor: "Please consider this formal notice that the [Back House] is currently encroaching on the neighboring properties to the west and north of it. Further, the [Back House] does not meet building and/or fire codes and further was built without City of Oakland building permits. As such it is not a legal structure. [¶] As owner of 480 McAuley Street, I reserve the right to pursue any remedy available to me should the use of the [Back House] in any way infringe or endanger my property. [¶] California law requires that these facts be disclosed to any and all future buyers of [the Property]." The e-mail was forwarded to Wulbert, who withdrew from the purchase contract.

Leonard subsequently had the Property surveyed and discovered that the rain gutters on the roof of the Back House were overhanging the Arudas' property by several inches. Leonard had the encroachment removed. He also obtained a permit history for the Property from the City of Oakland, which indicated that the Back House was legally constructed and in conformance with applicable state and city codes. He shared the results of the remediation work, the survey, and the permit history with the Arudas and then tried to meet with them to ensure they would not further interfere with his attempts to sell the Property. He was rebuffed.

Leonard again placed the Property on the market. On September 3, 2013, Leonard entered into a second sales contract with Lloyd and Dana Taylor. On September 13, Lloyd Taylor sent the following e-mail to the Arudas: "Dana and I are hoping to purchase [the Property]. . . . [¶] It's very important to us to have good relationships with

---

[2] We recite the facts as alleged in Leonard's complaint. (See *Dible v. Haight Ashbury Free Clinics, Inc.* (2009) 170 Cal.App.4th 843, 849; accord, § 425.16, subd. (b)(2).)

our neighbors. We understand from our realtor that there are outstanding issues, and would like to see if we can work them out together. [¶] Would you be able to meet with us on Monday? We'd love to sit down together and talk things through." The Arudas replied by e-mail: "I appreciate your reaching out to us. Unfortunately, we are not able to meet with you next week. [¶] As you may or may not know the [Back House] represents an ongoing nuisance to neighboring properties and also presents a health hazard to any future occupants. [¶] Due in direct part to the [Back House's] location, our property has been damaged and trespassed upon regularly. Although we have attempted to work with the previous owners and occupants, as well as [Leonard], even now our property continues to be damaged due to the [Back House's] location within the required setback areas. [¶] As the potential buyers of [the Property], you should know that we will no longer tolerate any trespasses onto our property and that we will seek full restitution for any and all damages that result[] from any occupation of or construction/maintenance work to the [Back House]. . . ." The Taylors withdrew from their purchase contract.

Leonard sued the Arudas for intentional interference with contractual relations and intentional and negligent interference with prospective economic relations with respect to both the Wulbert and the Taylor contracts. He sought damages, an injunction against future interference by the Arudas, and declaratory relief regarding the legality of the Back House, its compliance with building and fire codes, and its nonencroachment on the Aruda Property.

The Arudas filed a special motion to strike pursuant to section 425.16, the anti-SLAPP statute. They argued, "all of [Leonard's] claims arise from two email communications, . . . [which] involved important issues of public interest, namely consumer protection and public safety and therefore . . . qualify for First Amendment protection . . . . [¶] . . . [¶] . . . In the present matter, the Arudas' conduct intended to and did provide any and all potential buyers of the [Property] information regarding latent, material characteristics of the Back [House], and thus advanced the important public interest of consumer protection." They asserted that the e-mails also concerned a public safety issue because they reported the Back House did not meet fire codes and presented

3

a health hazard to occupants. "Not only was the information contained in the Aruda emails pertinent given the circumstances, but the steps taken by the Arudas to communicate the information [were] designed to inform as many potential buyers of the [Property] as possible." Leonard argued the anti-SLAPP statute did not apply because the case involved "a purely private dispute which affects no one outside the disputants."

The court filed a six-page order denying the motion. In sum, it ruled that "[the Arudas] have not shown that [Leonard's] causes of action arise from 'conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest.' (§ 425.16, subd. (e)(4).) . . . [E]ven construed broadly, the terms 'public issue' and 'issue of public interest,' which define the scope of subdivision (e)(4), cannot stretch to encompass this private dispute between neighbors over two private properties." The Arudas appeal.

## II.    DISCUSSION

The Arudas argue that in sending their e-mails to Leonard's realtor and the Taylors, they were "exercising their constitutional rights of free speech and petition and participating in matters of public significance."[3] They contend the communications were necessary to correct Leonard's "questionable" marketing claims for the Property, which had purportedly been published on real estate multiple listing services, on the Internet via real estate Web sites, and "via traditional marketing and advertising material." The Arudas assert that their conduct "provided consumers and the market actionable information with which to inform market decisions." Thus, they insist, Leonard's complaint challenges "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an

---

[3] Section 425.16 provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

4

issue of public interest" (§ 425.16, subd. (e)(4)),[4] and must be stricken. Despite the Arudas' efforts to characterize the e-mails otherwise, we agree with the trial court that these communications do not relate to a "*public issue*" or an "issue of *public interest.*"

A.      *Standard of Review*

"In ruling on an anti-SLAPP motion, the trial court engages in a two-step process. 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute. [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citations.] . . . [¶] On appeal, we review the motion de novo and independently determine whether the parties have met their respective burdens." (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 370–371 (*Cross*); *Equilon v. Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) The trial court resolved the anti-SLAPP motion on the first prong. Because we agree with the court's analysis on this issue, we need not consider the second prong.

B.      *Private Versus Public in the Anti-SLAPP Context*

The demarcation between entirely private conduct and matters of public interest is not always clearly drawn. *Cross* provides an overview of the case law in this area.

---

[4] Subdivision (e) of section 425.16 defines " 'act in furtherance of a person's right of petition or free speech' " to include: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech *in connection with a public issue or an issue of public interest.*" (Italics added.)

5

"[C]ourts have broadly construed ' "public interest" ' 'to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.]' (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 (*Damon*); [citations].) . . . '[A]lthough matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals.'[5] [Citations.] And . . . the legislative history of [the 1997] amendment [requiring the statute to be construed broadly (see § 425.16, subd. (a))] and the cases that precipitated it 'suggest that "an issue of public interest" . . . is *any issue in which the public is interested*. In other words, the issue need not be "significant" to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest.'[6]

"[T]hree non-exclusive and sometimes overlapping categories of statements . . . have been given anti-SLAPP protection. ([*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913,] 919–924.) The first category comprises cases where the statement or activity precipitating the underlying cause of action was 'a person or entity in the public eye.' (*Id*. at p. 924.) The second category comprises cases where the statement or activity precipitating the underlying cause of action involved 'conduct that could affect large numbers of people beyond the direct participants.' ([*Ibid*.]) And the third category comprises cases where the statement or activity precipitating the claim involved 'a topic of widespread, public interest.' (*Ibid*.) Courts have adopted these categories as a useful framework for analyzing whether a statement implicates an issue of public interest and thus qualifies for anti-SLAPP protection.

---

[5] *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650 (*Wollersheim*), disapproved on another point in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.

[6] *Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042 (*Nygård*).

"In *Weinberg* [*v. Feisel* (2003)] 110 Cal.App.4th 1122, the court, citing federal cases rather than state anti-SLAPP cases, enumerated what it considered to be additional attributes of an issue that would render it one of public, rather than merely private, interest. 'First, "public interest" does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citations.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort "to gather ammunition for another round of [private] controversy . . . ." [Citation.] Finally, . . . [a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people.' (*Id.* at pp. 1132–1133.)" (*Cross, supra,* 197 Cal.App.4th at pp. 372–374, fns. omitted.)

*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107 (*Du Charme*), also discussed in *Cross*, adopted a rule that " 'to satisfy the public issue/issue of public interest requirement . . . , in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance.' ([*Du Charme,*] at p. 119, fn. omitted.)" (*Cross, supra,* 197 Cal.App.4th at p. 380.) Finally, *Cross* noted that *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898 "expanded upon *Du Charme* and ruled that 'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*Cross, supra,* 197 Cal.App.4th at p. 381, fn. 15.)

C.      *The Arudas Fail to Establish Anti-SLAPP Coverage.*

The Arudas attempt to clothe their communications in a mantle of "consumer protection" public policy and the public's interest in health and safety matters. The law they cite in support of their position is either inapposite or otherwise distinguishable.

The case most factually analogous to the instant case is *Cross* itself, in which tenants were sued by the property owner for telling a prospective buyer of the home that a registered sex offender lived in the neighborhood. (*Cross, supra,* 197 Cal.App.4th at pp. 365–366.) The court held that the statement was made "in connection with an issue of 'widespread, public interest' " because of the express public policy favoring public dissemination of the location of sex offenders as embodied in Penal Code sections 290.4 and 290.45 (Megan's Law). (*Cross*, at pp. 375–378; *id.* at p. 366, fn. 3.) "The statements of [legislative] intent and the [Megan's Law] legislation . . . reflect heightened concern about the potential dangers posed by convicted sex offenders and strong and widespread public interest in knowing the location of registered sex offenders." (*Id.* at p. 377; see *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1653 [disclosure that a prospective employee was listed on the Megan's Law sex offender Web site was "constitutionally protected speech on a subject of public interest" covered by the anti-SLAPP statute].)

As the trial court recognized, *Cross* is distinguishable because the subject matter of the Arudas' e-mails furthered no comparable public policy. The Arudas cite statutes governing real estate disclosures as "evidence that the free flow of information to the real estate marketplace specifically is an activity of public significance for which participation should be encouraged." The cited statutes, however, aim to enhance *private* contracting by ensuring that relevant information is disclosed to prospective homebuyers by a seller or broker. (Civ. Code, §§ 1102, subd. (a), 1102.1, 1102.6, 2079, subd. (a).) Megan's Law, in contrast, seeks to protect children and other potential victims of sexual assault everywhere by disseminating information to the general public about the location of sex

offenders throughout the state.[7] (Pen. Code, §§ 290.4, 290.45.) As the trial court observed, if the Arudas' argument were accepted, "a huge proportion of the items and services involved in private commercial transactions each day in this State would all become issues of pubic interest, given how many commercial transactions trigger some duty of disclosure under various state laws."

Similarly, *Damon*, *Wollersheim* and *Nygård* all include broad language on the scope of "public interest," but the factual contexts of these cases are easily distinguishable. (*Damon, supra,* 85 Cal.App.4th at p. 479 [statements that criticized management of a 3,000-member homeowners association affected "a community in a manner similar to that of a government entity"]; *Wollersheim, supra,* 42 Cal.App.4th at pp. 650–651 [statements pertained to prior litigation that involved extent of constitutional protection for the Church of Scientology's religious activities; the church itself was "a large, powerful organization [that affected] the lives of many individuals" and was subject to widespread media coverage]; *Nygård, supra,* 159 Cal.App.4th at pp. 1032–1034, 1042 [statements by former employee of " 'internationally known public figures,' " who employed over 12,000 employees worldwide and who were subject to " 'extensive interest' " by a defendant magazine's readership].) The Arudas' e-mails did not concern any kind of large powerful or governing organization and did not involve underlying constitutional issues.[8] None of the parties here are "internationally known public

---

[7] *Cross* noted that Civil Code section 2079.10a requires home sellers to provide information about sex offender databases to prospective buyers, but *Cross* did not rely on this disclosure statute alone to support its holding that the tenants' disclosure of such information was covered by the anti-SLAPP statute. (*Cross, supra,* 197 Cal.App.4th at pp. 377–378.) The crux of *Cross*'s rationale is that Megan's Law represents a public policy favoring dissemination of information about sex offenders to the general public. (*Id.* at pp. 375–377.)

[8] The Arudas' reliance on *Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528 is unavailing in the anti-SLAPP context. In that case a homeowner successfully appealed a preliminary injunction that prohibited her from making true statements about the quality of construction in a development, statements that allegedly interfered with sales of additional homes in the development. The court held that the homeowner's speech enjoyed greater First Amendment protection than commercial

9

figures," and neither they nor the Property have been the subject of media coverage, extensive or otherwise.[9] Leonard's business of selling a single property was not one that affected a large number of people, and his business practices were not a topic of widespread public interest. At least so far as the record here shows, only Wulbert and the Taylors expressed interest in purchasing the Property, and there is no evidence that other immediately adjacent property owners have exhibited any interest in this issue, much less members of the public generally.

The Arudas' citation to *Du Charme, supra,* 110 Cal.App.4th 107 is likewise unavailing. In *Du Charme*, the court held the anti-SLAPP statute did not apply to a defamation action based on statements on a union local's Web site stating the reasons a business manager had been fired. (*Id.* at pp. 110, 119.) Here, even fewer people were affected. It would be difficult on this record to even find that the subject matter of the Arudas' e-mails was an issue of interest "to a limited, but definable portion of the public." (*Id.* at p. 119.) Even aggregating the Arudas, Leonard and all potential purchasers of the Property, they remain unassociated individuals whose paths only happened to intersect in a prospective commercial transaction, complicated by a pre-

_____

speech because it related to the public interest by providing consumer information. (*Id.* at pp. 1534–1536, 1543–1545.) However, *Paradise Hills* did not involve application of the anti-SLAPP statute, but rather a prior restraint on speech that carries a heavy presumption against its validity. (*Id.* at pp. 1538–1539.)

[9] The Arudas seem to equate marketing of the Property on listing services and on realtor Web sites with "media" coverage, asserting that "the fact that the [Property] was being offered for sale on the open market, together with [Leonard's] widespread marketing campaign made the subject property an issue of widespread public interest." We are aware of no authority that has adopted such a sweeping view, and find it difficult to imagine that the Legislature would have envisioned such an unrestricted application of the statute. Under the view suggested by the Arudas, even mundane Facebook or Twitter postings would automatically create issues of "public" interest by virtue of the forum. The fact that some individual members of the public might have an interest in a topic does not make it a matter of "widespread" public interest. (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at pp. 1132–1133 [" 'public interest' does not equate with mere curiosity" and "[a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people"].)

10

existing dispute between neighbors. They are not a "group, organization, or community" in the throes of an "ongoing controversy, dispute or discussion" in which application of the anti-SLAPP statute would encourage participation. (See *Cross, supra,* 197 Cal.App.4th at p. 380.) Were we to countenance application of the anti-SLAPP statute in this context, it would become a sword in the arsenal of routine civil procedure rather than a shield protecting First Amendment rights. (See *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, supra,* 105 Cal.App.4th pp. 916–917, 924–925 [statements about dispute between eight janitors and their supervisor were *not* on a matter of public interest even though they generally related to public university labor relations, which may have interested the general public or community of 17,000 employees].)

Finally, *Wilbanks v. Wolk, supra,* 121 Cal.App.4th 883 does not assist the Arudas. The *Wilbanks* defendant maintained a "consumer information" Web site that provided "information about those who broker life insurance policies, including information about licenses, suits brought by clients against brokers and investigations of brokers by governmental agencies." (*Id.* at pp. 889–890.) The court held that statements on the Web site (the basis of a defamation suit) met the threshold showing of anti-SLAPP protection because they "were not simply a report of one broker's business practices, of interest only to that broker and to those who had been affected by those practices. [They] were a warning not to use plaintiffs' services [i]n the context of information ostensibly provided to aid consumers in choosing among brokers . . . ." (*Id.* at p. 900.) Here, the illegality alleged in the Arudas' e-mails (encroachment and code violations on the Property) were not matters of concern to a substantial number of people, but matters of interest only to the Property owner, neighbors and prospective buyers (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at p. 1132 ["a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest"]). The Arudas' protestations notwithstanding, there is no evidence that their privately e-mailed communications were distributed for the purpose of consumer protection, or to protect the public generally—the communications targeted only individuals directly involved in a

11

single commercial transaction and were only tenuously connected to "a broad and amorphous public interest" (*Weinberg,* at p. 1132).[10]  (See *Makaeff v. Trump University LLC* (9th Cir. 2013) 715 F.3d 254, 260–263 [student's statements to Better Business Bureau and on Internet about Trump University (associated with Donald Trump) were protected by anti-SLAPP statute because they plausibly were made " 'to alert other consumers of [her] opinions and experience' " and involved an entity and individual prominently in the public eye].)

In sum, the Arudas have not carried their burden to show that Leonard's cause of action is covered by the anti-SLAPP statute, and the trial court properly denied the motion.  (See *Equilon v. Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.)

### III.    DISPOSITION

The order denying the Arudas' anti-SLAPP motion is affirmed.  The Arudas shall bear Leonard's costs on appeal.

---

[10] The Arudas argue that their e-mails performed a consumer information function because those e-mails were designed to, and had the effect of, prompting Leonard to correct the information posted on a Web site.  The Arudas' evidence of the alleged Internet postings, however, are printouts of Web pages apparently from an independent third party site (<http://www.zillow.com/>) that describe the Property but state it is not for sale.  The source of the Property descriptions on the Web page is not clear.  In any event, this Internet publication is not remotely comparable to the "consumer information" Web site maintained by the defendant in *Wilbanks v. Wolk, supra,* 121 Cal.App.4th at pages 889–890.

The Arudas also argue that because the e-mails were sent to the realtor and prospective buyers, those communications were unlikely to resolve their grievances with Leonard and thus evidence an altruistic intent on their part.  However, the e-mails threatened potential buyers with litigation over matters that affected only their property and clearly sought to make it difficult, if not impossible, for Leonard to sell the Property.

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

NEEDHAM, J.