**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PLANET AID, INC., A Massachusetts Corporation which has its principal place of business in Howard County, Maryland; LISBETH THOMSEN, An alien and permanent resident of Chilangoma, Malawi, *Plaintiffs-Appellants*, <br><br> v. <br><br> REVEAL; CENTER FOR INVESTIGATIVE REPORTING; MATT SMITH; AMY WALTERS, *Defendants-Appellees.* | No. 21-15690 <br><br> D.C. No. 3:17-cv-03695-MMC <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted June 14, 2022
San Francisco, California

Filed August 11, 2022

Before: Sidney R. Thomas, Ronald M. Gould, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge S.R. Thomas

## SUMMARY[*]

### California's Anti-SLAPP Statute

The panel affirmed the district court's order granting the Reporters with the Center for Investigative Reporting ("CIR")'s anti-SLAPP motion to strike a complaint alleging defamation under California law.

Matt Smith and Amy Waters were reporters with CIR ("Reporters") and they published stories alleging misuse of funds by two charitable organizations, Planet Aid, Inc., and Development Aid from People to People Malawi ("DAPP Malawi"). In response, Planet Aid and the director of DAPP Malawi, Lisbeth Thomsen, filed a defamation suit.

In a number of decisions, the U.S. Supreme Court established that public officials and public figures claiming defamation must prove that an allegedly defamatory statement was made with "actual malice." The Supreme Court identified two types of public figures: all purpose public figures and limited-purpose public figures. All-purpose public figures must prove actual malice for virtually any subject of defamation, while limited-purpose public figures, who have assumed prominence on a limited range of issues, need only prove actual malice for speech touching upon those issues. In *Makaeff v. Trump Univ., LLC*, 715 F.3d 242 (9th Cir. 2013), this court articulated a three-prong test to determine whether an individual or entity is a limited-purpose figure.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court correctly found that Planet Aid and Thomsen were limited-purpose public figures and that the Reporters did not act with "actual malice" within the meaning of *New York Times Company v. Sullivan*, 376 U.S. 254 (1964). The panel agreed with the district court's determination in applying the *Makaeff* test that: (i) there was an existing public controversy with respect to Planet Aid and Lisbeth Thomsen's use of charitable funds; (ii) the Reporters' alleged defamation was relevant to this preexisting controversy; and (iii) the voluntariness requirement—which examines whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution—was satisfied. The panel further agreed with the district court, for the reasons stated by the district court in its order, that a reasonable factfinder could not find, by clear and convincing evidence, that the Reporters acted with actual malice. The panel therefore affirmed the district court's grant of the Reporters' motion to strike the complaint under California's anti-SLAPP statute.

## COUNSEL

Samuel Rosenthal (argued), Nelson Mullins LLP, Washington, D.C.; James M. Wagstaffe and Michael von Loewenfeldt, Wagstaffe von Loewenfeldt Busch & Radwick LLP, San Francisco, California; for Plaintiffs-Appellants.

Thomas R. Burke (argued), Davis Wright Tremaine LLP, San Francisco, California; Ambike K. Doran, Davis Wright Tremaine LLP, Seattle, Washington; Brendan Charney and Andrew G. Row, Davis Wright Tremaine LLP, Los Angeles, California; Simon J. Frankel, Alexa Hansen, Alison Wall, Annie Shi, and Miriam Arghavani, Covington & Burling

LLP, San Francisco, California; Eric Chung, Covington & Burling LLP, Washington, D.C.; for Defendants-Appellees.

Deborah J. Dewart, Hubert, North Carolina, for Amicus Curiae Liberty, Life, and Law Foundation.

Elizabeth M. Locke, Joseph R. Oliveri, and Daniel D. Mauler, Clare Locke LLP, Alexandria, Virginia, for Amicus Curiae Clare Locke LLP.

Theodore J. Boutrous Jr. and Michael H. Dore, Gibson Dunn & Crutcher LLP, Los Angeles, California; Katie Townsend, Sarah S. Matthews, and Charles Hogle, Reporters Committee for Freedom of the Press, Washington, D.C.; for Amici Curiae Reporters Committee for Freedom of the Press and 32 Media Organizations.

## OPINION

S.R. THOMAS, Circuit Judge:

In this appeal we must determine whether a charity and the director of a charity are limited-purpose public figures under the First Amendment. Reporters with the Center for Investigative Reporting published stories alleging misuse of funds by two charitable organizations, Planet Aid, Inc. ("Planet Aid") and Development Aid from People to People Malawi ("DAPP Malawi"). In response, Planet Aid and the director of DAPP Malawi, Lisbeth Thomsen, filed a defamation suit. The district court granted the Reporters' motion to strike the complaint under California's anti-SLAPP statute, correctly finding that Planet Aid and Thomsen are limited-purpose public figures and that the reporters did not

act with "actual malice" within the meaning of *New York Times Company v. Sullivan*, 376 U.S. 254 (1964).  We affirm.

## I

The Center for Investigative Reporting ("CIR") is a California-based, nonprofit, investigative news organization. CIR publishes its reporting on various platforms, including its news website Reveal (www.revealnews.org), national radio show, and podcast.  Matt Smith and Amy Walters were reporters with CIR.  Between 2014 and 2017, CIR, Smith, and Walters (collectively, "CIR" or the "Reporters") investigated and published a series of articles and podcasts reporting on the misuse of charitable funds by Planet Aid and its affiliate organization DAPP Malawi.

## A

Planet Aid is a nonprofit charitable organization headquartered in Maryland with the stated mission of helping impoverished populations throughout the world.  Planet Aid is recognized by the U.S. Internal Revenue Service ("IRS") as a 501(c)(3) tax-exempt charity.  It resells used clothing donated by the public, obtains government grants, and solicits corporate donations to generate funds.  Since its inception in 1997, Planet Aid claims to have provided more than $100 million to support projects on three continents in the areas of education, teacher training, nutrition, and agricultural and economic development.

Planet Aid's fundraising efforts are highly successful and recognizable.  It fundraises by going door to door to solicit donations as well as setting up clothing donation bins that have become nearly ubiquitous across the United States.  In

partnership with schools, business groups, religious institutions, nonprofits, and various organizations across the country, Planet Aid placed over 20,000 donation bins nationwide. Its signature, bright-yellow bins are present in 20 states and have achieved a degree of celebrity in popular culture. For example, the bins were featured in an episode of the popular television series "The Big Bang Theory," which Planet Aid eagerly promoted on its social media pages.

Planet Aid regularly engages with the press and actively cultivates a public image. It issues frequent press releases to generate attention regarding its charitable programs and activities. For instance, Planet Aid issued numerous press releases over the years to advertise the environmental benefits of its efforts to collect and resell donated clothing. Other examples of Planet Aid's public self-promotion abound. In March of 2014, Planet Aid distributed press releases regarding a teacher training program it helped fund in Malawi. In June of 2016, it issued press releases regarding dignitaries' visits to a nutritional program it was running for schoolchildren in Mozambique. It has hosted large galas to celebrate its charitable successes and promoted those galas to the press. Planet Aid also publicizes itself through social media. It has a YouTube page featuring videos about its charitable activities, some of which have thousands of views. Additionally, it regularly posts on Facebook and Twitter to its thousands of followers.

From its inception, Planet Aid has drawn public attention and comment. For decades, the global press has reported on its relationship with a controversial web of charitable organizations accused of misusing funds and its association with a Danish cult. In 1993, a few years before Planet Aid was incorporated, the *Edmonton Journal* reported that "an

international organization that specializes in collecting used clothes for southern Africa," was "attracting criticism from Denmark to the Arctic Circle" because many "Europeans who donate their old [clothes] don't know the garments end up being sold at market prices in Africa—with much of the profit filtered into what seem less than altruistic causes." This organization, known as "Humana" was reportedly affiliated with the Development Aid People to People ("DAPP") network. According to the article, "[t]hrough a complex web of financial interests, the Humana/DAPP network runs a financial system out of the Cayman Islands" that includes "holding companies," "Caribbean fruit plantations," and "a yacht dealership." The article further alleged that Humana and DAPP began as a group of radical Danish school teachers in the early 1970s, called "Tvind."

Then, according to a Danish newspaper, "after the Danish government fund slammed the door on subsidies," Tvind "beg[an] an unprecedented, mammoth expansion drive in the USA and Canada to raise millions for its international activities," including "found[ing] the organization Planet Aid." In 2001, Tvind's founder, Mogens Amdi Petersen, was prosecuted by Danish authorities for "using his control of Tvind and its related [organizations] to divert funds that were supposedly intended for charitable and other public purposes."

Multiple major news organizations in the United States and overseas reported on the trial and raised concerns about Planet Aid's connection to Tvind and its use of charitable funds. In 2002, the *Boston Globe* linked Planet Aid to Petersen, who faced "charges of tax fraud and embezzlement of millions of dollars from a vast international network of charities," and reported that "only about 6 percent of the

money [Planet Aid] raises is spent on charity." Several other publications reported that the American Institute of Philanthropy and the Better Business Bureau were critical of Planet Aid's use of funds. These concerns reverberated from *The Washington Post* (May 2003 article), to the *Chicago Tribune* (Feb. 2004 and May 2011 articles), to the *Los Angeles Times* (Aug. 2015 article).[1] Several international publications also covered the controversy.

B

Lisbeth Thomsen is the director of DAPP Malawi, a nonprofit charitable organization based in Malawi. Thomsen has worked in Malawi for nearly three decades and has worked specifically for DAPP Malawi for over two decades. Thomsen helped lead the organization's poverty reduction and humanitarian efforts, establishing pre-schools, teacher training colleges, HIV/AIDs counseling centers, door-to-door educational campaigns, and other initiatives.

As the director of DAPP Malawi, Thomsen was its spokesperson. When DAPP Malawi opened a school or unveiled a new charitable program, she spoke at public gatherings before local officials and community members to promote the initiative. Thomsen regularly spoke to the press

---

[1] In addition to the above articles, numerous other U.S. news organizations have also reported on this controversy, including the following: *The Wisconsin State Journal* (Apr. 2002); *The Brattleboro Reformer* in Vermont (Apr. 2005); *The Sacramento Bee* (Nov. 2006); *Lancaster Online* in Pennsylvania (Jul. 2007); the *Rochester Democrat and Chronicle* in New York (Sep. 2007); *Citizens' Voice* in Pennsylvania (Dec. 2007); *The Times-Tribune* in Pennsylvania (Dec. 2007); *The Lebanon Daily News* in Pennsylvania (Jan. 2008); *The Burlington Free Press* in Vermont (Oct. 2008); *The Philadelphia Inquirer* (Dec. 2012).

to generate attention regarding the successes of DAPP Malawi's programs. She was featured regularly on DAPP Malawi's Facebook and Twitter pages and appeared in promotional YouTube videos about DAPP Malawi's work. Thomsen employed a public relations team, which helped her seek out positive press coverage and public appearances, and develop responses to negative publicity.

Like Planet Aid, DAPP Malawi was long embroiled in the Tvind controversy. The press repeatedly linked DAPP Malawi to the Danish cult leader who was prosecuted for charity fraud. Additionally, several articles in Malawi newspapers raised concerns or made allegations about DAPP Malawi's misuse of charitable funds under the leadership of Lisbeth Thomsen. In 2002, the *Malawi News* linked Tvind, Humana, and DAPP Malawi, reporting allegations that "Dapp Malawi uses its second hand clothes shops to raise funds which are later transferred back to Denmark through . . . a dubious scholarship scheme." In 2003, *The Chronicle Newspaper* reported that "[i]n Malawi, government is now probing activities of DAPP Malawi, following . . . [accusations that] scholarships and other funds meant for Malawian students allegedly have been channeled to Denmark." In 2011, the *Nyasa Times* reported that "employees at [DAPP Malawi] have turned against their employers, accusing them of secretly swindling money for unknown activities."

## C

In June of 2005, the U.S. Department of Agriculture ("UDSA") awarded Planet Aid a grant through its "Food for Progress" program. The grant gave Planet Aid approximately $23 million to administer poverty reduction programs in

Malawi including building, staffing, and operating schools to train teachers in Malawi; educating the Malawian population about risks associated with HIV and AIDs; teaching farmers about agricultural techniques to improve crop yields; and educating the population about nutrition. Planet Aid asked Thomsen to help administer the USDA grant in her role as director of DAPP Malawi.

In 2014, reporters at CIR began to investigate Planet Aid and DAPP Malawi's use of the USDA grant funds. Between March and May 2016, they published a podcast, along with several news articles and social media posts, alleging that Planet Aid, DAPP Malawi, and Lisbeth Thomsen misused the funds. The publications alleged that Planet Aid and Lisbeth Thomsen stole USDA funds by diverting funds from their intended recipients, falsifying invoices, failing to provide livestock and agricultural inputs to local farmers, and extracting kickbacks from the salaries of DAPP Malawi employees.

In August of 2016, Planet Aid and Lisbeth Thomsen filed a defamation suit against the Reporters. In July of 2018, the Reporters moved under California's anti-SLAPP law, California Code of Civil Procedure § 425.16, to strike the defamation claim.[2]    After significant discovery was conducted, in March of 2021, the district court granted the motion to strike. The district court found that several statements by the Reporters were false, but recognized that Planet Aid and Thomsen are limited-purpose public figures

---

[2] Planet Aid and Lisbeth Thomsen forfeited any argument that California's anti-SLAPP statute may not be applied in federal court by failing to specifically and distinctly argue this issue in their opening brief. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

in connection with their use of charitable funds and that the Reporters did not act with "actual malice." *N.Y. Times*, 376 U.S. at 280.

## II

"California law provides for the pre-trial dismissal of certain actions, known as Strategic Lawsuits Against Public Participation, or SLAPPs, that masquerade as ordinary lawsuits but are intended to deter ordinary people from exercising their political or legal rights or to punish them for doing so." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (citations and quotation marks omitted); *see also Wilcox v. Super. Ct.*, 33 Cal. Rptr. 2d 446, 450 (Cal. Ct. App. 1994)*.* We have jurisdiction to review the district court's grant of the Reporters' anti-SLAPP motion under 28 U.S.C. § 1291. Because the motion challenges the factual sufficiency of Planet Aid and Thomsen's defamation claim, "the motion must be treated as though it were a motion for summary judgment." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018) (citation omitted).

We review de novo whether summary judgment was properly entered. *L.F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020). Whether a plaintiff is a public figure is a legal question to be reviewed de novo. *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 888 (9th Cir. 2016). Moreover, we "must make an independent examination of the whole record, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1113 (9th Cir.

2003) (citing *N.Y. Times*, 376 U.S. at 284 (internal quotation marks omitted)).

### III

The Supreme Court has long enshrined "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," *N.Y. Times*, 376 U.S. at 270, as well as "public figures," *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154 (1967). Thus, an action for defamation can be maintained only to the extent it does not interfere with First Amendment rights of free expression.

In the landmark decisions of *New York Times Company v. Sullivan*, and *Curtis Publishing Company v. Butts*, the Supreme Court established that public officials and public figures claiming defamation must prove that the allegedly defamatory statement was made with "actual malice"—that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times*, 376 U.S. at 280; *Curtis Publ'g Co.*, 388 U.S. at 134. The Court recognized that actual malice standard would bar some plaintiffs from recovering damages for erroneous and injurious statements. *N.Y. Times*, 376 U.S. at 270–72. Nevertheless, the Court concluded that the law of defamation must provide a degree of "breathing space" to avoid chilling constitutionally valuable speech. *Id.* at 271–72.

Subsequently, in *Gertz v. Robert Welch, Inc.*, the Supreme Court identified two types of public figures: (1) all-purpose public figures, who occupy "positions of such persuasive

power and influence that they are deemed public figures for all purposes," and (2) limited-purpose public figures, who achieve their status by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U.S. 323, 345 (1974). Both categories of public figures, the Court noted, "have assumed roles of especial prominence in the affairs of society" and "invite[d] attention and comment." *Id.* All-purpose public figures must prove actual malice for virtually any subject of defamation. Limited-purpose public figures, who have assumed prominence on a limited range of issues, need only prove actual malice for speech touching upon those issues.

The Court articulated two justifications for requiring public figures to show actual malice. The first was self-help. Public figures enjoy "greater access to the channels of effective communication" than private individuals and are therefore better able to "contradict the lie or correct the error." *Id.* at 344. The second and "[m]ore important" justification was the notion of assumption of risk. *Id.* Public figures, who have thrust themselves into the public eye, "must accept certain necessary consequences" of that conduct, including "the risk of closer public scrutiny than might otherwise be the case." *Id.* at 344–45. The *Gertz* Court also emphasized the critical importance of "lay[ing] down broad rules of general application" in order to avoid "unpredictable results and uncertain expectations," which might discourage freedom of expression. *Id.* at 343–44; *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989) ("Uncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords.").

A

In *Makaeff v. Trump University*, drawing from *Gertz* and other case law, we articulated a three-prong test to determine whether an individual or entity is a limited-purpose public figure:

> In undertaking this inquiry, we consider whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to the plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution.

*Makaeff*, 715 F.3d at 266 (citing *Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 762 (Cal. Ct. App. 2007)). In its decision below, applying *Makaeff*, the district court determined (i) that there was an existing public controversy with respect to Planet Aid and Lisbeth Thomsen's use of charitable funds; (ii) that the Reporters' alleged defamation was related to this preexisting controversy; and (iii) that the voluntariness requirement was satisfied. We agree.

1

Under the first *Makaeff* prong, we consider whether "a public controversy existed when the [allegedly defamatory] statements were made." *Makaeff*, 715 F.3d at 266 (citation omitted). Public interest or attention alone is not sufficient to create a public a controversy. *Time, Inc. v. Firestone*, 424 U.S. 448, 454–55 (1976). A public controversy must be

"a real dispute, the outcome of which affects the general public or some segment of it." *Makaeff*, 715 F.3d at 267 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)); *see also Waldbaum*, 627 F.2d at 1297 ("If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.").

We have little difficulty in concluding that genuine public controversies existed at the time the Reporters published their statements about Planet Aid and Lisbeth Thomsen. Long before the Reporters published any articles about Planet Aid, countless news outlets published articles questioning Planet Aid's integrity and examining the extent to which its charitable funds were being used for their intended purposes. Planet Aid was repeatedly linked by the press to the founder of a Danish charity who was prosecuted for illegally diverting charitable funds. Additionally, Planet Aid raised over a $100 million in charitable funds. It received tax exemptions from the U.S. government to help the poor. This was a genuine public controversy; the extent to which Planet Aid's funds were being used for their intended purposes has ramifications both for American taxpayers and for the advertised recipients of those charitable funds. *See Makaeff*, 715 F.3d at 267; *Waldbaum*, 627 F.2d at 1297.

Additionally, before CIR's reporting on Lisbeth Thomsen, numerous articles had been published about DAPP Malawi's use of charitable funds under Thomsen's leadership. DAPP Malawi was linked by the press to the Danish criminal prosecution. Various articles questioned its integrity, the extent to which it was using its funds to aid the poor, and the extent to which it was channeling funds towards controversial organizations known for misusing charitable funds. Like

Planet Aid, DAPP Malawi received donations and grants to aid impoverished communities in Malawi. This too was a genuine public controversy. *See Makaeff*, 715 F.3d at 267; *Waldbaum*, 627 F.2d at 1297.

2

*Makaeff* also asks us to consider "whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution." 715 F.3d at 266. This voluntariness requirement has been interpreted broadly, both by *Makaeff* and by other courts. Voluntariness is not confined to those who seek to influence the resolution of a single issue. Rather, voluntariness can also be satisfied by a showing that a person or entity engaged in a course of conduct that foreseeably put themselves at risk of public scrutiny with respect to a limited range of issues.

In *Makaeff*, we deemed Trump University a limited-purpose public figure for issues arising from its advertising efforts. Trump University had long been engaged in an "aggressive advertising campaign," promoting its educational products and services on "social media, local and national newspaper, [and the] radio." *Id.* at 268–69. After a disgruntled former customer disparaged Trump University and sued it for deceptive business practices, it filed a defamation counterclaim. *Id.* at 267. In classifying Trump University a limited-purpose public figure, we held that "large scale, aggressive advertising can inject a person or entity into a public controversy that arises from the subject of that advertising." *Id.* at 267. Because Trump University's "extensive advertising efforts 'invited public attention, comment, and criticism,'" the voluntariness requirement was satisfied with respect to issues related to those advertising

efforts. *Id.* at 269 (quoting *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 274 (3d Cir. 1980)).

Other circuits have also interpreted the voluntariness requirement broadly. For example, the Third Circuit deemed an architect-engineer a limited-purpose public figure with respect to his participation in controversial public building projects. *McDowell v. Paiewonsky*, 769 F.2d 942, 944 (3d Cir. 1985). McDowell regularly contracted with the government of the Virgin Islands to build public projects. *Id.* at 945. Subsequently, McDowell was criticized by the media for his performance on several projects and possible conflicts of interests involved in his being awarded various contracts. *Id.* at 948. The court designated McDowell a limited-purpose public figure for the purpose of his defamation claim. *Id.* at 949. By repeatedly working on high-profile, controversial public building projects, the court explained, McDowell "can be considered to have voluntarily assumed a position that invited attention." *Id.* at 950. This was "sufficient to transform him into a public figure for the limited purpose of his work on publicly financed building projects." *Id.*

The Fifth Circuit likewise deemed Louis Rosanova a limited-purpose public figure in the context of his connection to organized crime. *Rosanova*, 411 F. Supp. at 440, *aff'd*, 580 F.2d at 862. Rosanova had longstanding relationships with various members of organized crime as well as with the Teamsters union and its president. *Id.* at 444. Rosanova filed a defamation suit after being characterized as a "California mobster" in a magazine article. The court classified Rosanova as a limited-purpose public figure, rejecting his argument that he had not thrust himself into the vortex of any single public issue. *Id.* at 445. By associating with organized crime, the court explained, "Rosanova voluntarily engaged in

a course [of conduct] that was bound to invite attention and comment" with respect to those relationships. *Id.*; 580 F.2d at 862; *see also Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990) (finding that plaintiff, Clyburn, satisfied the voluntariness requirement in part by "hobnob[ing] with high officials").

Under this "course of conduct" approach to the voluntariness requirement reflected in *McDowell*, *Rosanova*, and the other cases identified above, it is quite clear both Planet Aid and Lisbeth Thomsen actively engaged in conduct that invited public comment and attention. Planet Aid regularly engages with the press in an effort to cultivate a public image, including by issuing press releases, hosting galas, and publicizing itself to thousands of followers through social media. Additionally, Planet Aid aggressively solicits donations from the public. *Nat'l Found. for Cancer Rsch., Inc. v. Council of Better Bus. Bureaus, Inc.*, 705 F.2d 98, 101 (4th Cir. 1983) (finding that a charity "thrust itself into the public eye" by soliciting donations from the public). It is clear from the record that Planet Aid "attempted, through various means at its disposal, to put itself and its methods before the public." *Id.* at 102; *see also Ampex Corp. v. Cargle*, 27 Cal. Rptr. 3d 863, 870 (Cal. Ct. App. 2005) ("[I]t is sufficient that the plaintiff attempts to thrust him or herself into the public eye."). Thus, by inviting public attention regarding its charitable activities and charitable funds, Planet Aid satisfied the voluntariness requirement for those limited purposes.

Similarly, as the director of DAPP Malawi, Thomsen served as its spokesperson. She spoke at public gatherings to promote DAPP Malawi's programs and initiatives, she spoke to the press to generate attention regarding its programs, and

she employed public relations staff to cultivate her public image. Like Planet Aid, DAPP Malawi also solicited donations and grants. By taking on the role of DAPP Malawi's spokesperson and regularly engaging in public-facing and attention-generating activities, Thomsen invited public scrutiny, thereby satisfying the voluntariness requirement.

Classifying Planet Aid and Lisbeth Thomsen as limited-purpose public figures through a course of conduct that invites public attention is consistent with the rationales articulated in *Gertz*. By actively seeking attention from the press, promoting themselves through social media, employing public relations staff, and soliciting donations and grants, Planet Aid and Thomsen assumed a risk of public scrutiny. By regularly providing statements to the press, Planet Aid and Thomsen both demonstrate a greater access to channels of effective communication than private individuals, and therefore an ability to counteract false statements through self-help.[3]

---

[3] Planet Aid and Thomsen, relying on *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), seek to portray themselves as victims of the Reporters' attempt to create a defense from defamation by turning the plaintiffs into public figures. There are two major distinguishing factors between *Hutchinson* and the present case. First, in *Hutchinson*, the plaintiff was a relatively obscure scientist prior to the allegedly defamatory statements. By contrast, in this present case, Planet Aid and Thomsen were the subject of significant public notoriety and scrutiny well before the allegedly defamatory publications. Second, unlike the plaintiff in *Hutchinson*, Planet Aid and Thomsen did not unwittingly become the subject of publicity with respect to its charitable activities and use of funds. To the contrary, they both actively thrust themselves into the public eye.

3

Finally, under *Makaeff*, we consider "whether the alleged defamation is related to the plaintiff's participation in the controversy." *Id.* at 266; *see also Waldbaum*, 627 F.2d at 1298 ("Misstatements wholly unrelated to the controversy . . . do not receive the New York Times protection."). Here, there was a preexisting public controversy about Planet Aid and Lisbeth Thomsen's misuse of charitable funds generally. CIR subsequently reported on their misuse of a particular grant from the USDA. Moreover, Planet Aid and Lisbeth Thomsen invited public attention regarding their use of charitable funds through press releases, promotion of charitable programs, soliciting donations from the public, and other activities. Thus, the alleged defamation is related to Planet Aid and Thomsen's participation in the controversy.[4]

In sum, the district court correctly designated Planet Aid and Thomsen as limited-purpose public figures with respect to their use of charitable funds.

---

[4] In an attempt to defeat the relatedness requirement, Planet Aid and Thomsen advocate for narrow definitions of the relevant public controversies under the first prong of *Makaeff*. They argue that the preexisting controversies concerned "the use of recycling bins for used clothing" and "charges brought against Peterson in Denmark." They further argue that the Reporters' defamatory publications concerned only "USDA funding" and, therefore, that the prior controversies and the defamation are unrelated. This argument is unpersuasive and unsupported by the law. The preexisting public controversy need not be narrowly defined or limited to the exact factual contours of the alleged defamation. The "narrow controversy" about Planet Aid and Lisbeth Thomsen's misuse of USDA funding is "a phase of another, broader" controversy about their practice of misusing of charitable funding generally. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016); *see also id.* ("Indeed, courts often define the public controversy in expansive terms.").

B

Because Planet Aid and Thomsen are limited-purpose public figures, their defamation claim can survive an anti-SLAPP or summary judgment motion "only if the evidence in the record would permit a reasonable finder of fact, by clear and convincing evidence, to conclude that [the Reporters] published a defamatory statement with actual malice." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 508 (1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–256 (1986). Actual malice is a subjective test; it means that the Reporters must have published a statement with "knowledge that it was false" or "reckless disregard of whether it was false or not." *N.Y. Times*, 376 U.S. at 280. Reckless disregard, in turn, means that the Reporters "in fact entertained serious doubts as to the truth" of the statement in question. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The district court undertook a thorough and detailed analysis of the actual malice assertions. The record supports the district court's conclusion. Therefore, we agree with the district court that, for the reasons stated by the district court in its order, a reasonable fact finder could not find, by clear and convincing evidence, that the Reporters acted with actual malice.

IV

Planet Aid and Lisbeth Thomsen are public figures for the limited purpose of the public controversy surrounding their use of charitable funds. The district court correctly concluded that a reasonable fact finder could not find, by clear and convincing evidence, that the Reporters acted with actual malice in publishing the allegedly defamatory statements. We therefore affirm the district court's grant of the Reporters'

motion to strike the complaint under California's anti-SLAPP statute.

**AFFIRMED.**